# NO. 12-15-00014-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *EAST TEXAS MEDICAL CENTER D/B/A EAST TEXAS MEDICAL CENTER EMERGENCY MEDICAL SERVICES,*<br>*APPELLANT* | *§* | *APPEAL FROM THE 7TH* |
| *V.* | | |
| | *§* | *JUDICIAL DISTRICT COURT* |
| *JODY DELAUNE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF CRYSTAL DELAUNE, DECEASED, AND AS NEXT FRIEND OF D. D., D. D. AND D. A. D.,* | | |
| *MINORS,* | *§* | *SMITH COUNTY, TEXAS* |
| *APPELLEE* | | |

## *MEMORANDUM OPINION*

East Texas Medical Center d/b/a East Texas Medical Center Emergency Medical Services (ETMC-EMS) appeals from a judgment rendered against it in favor of Jody Delaune, individually, as personal representative of the estate of Crystal Delaune, deceased, and as next friend of D.D., D.D., and D.A.D., minors (the Delaunes). ETMC raises two issues on appeal. We affirm.

## BACKGROUND

Crystal Delaune suffered from a psychological disorder. Her friends and family were concerned, and one of her friends asked the Cherokee County Sheriff's Office to conduct a welfare check. Cherokee County Deputy Brent Dickson responded to the call and visited the Delaunes. He received conflicting information from Crystal and her husband, Jody. Crystal said

that she needed help because Jody was physically abusing her. Jody recounted that Crystal had been acting oddly and that she needed medical care. Deputy Dickson took Crystal from the home.

Initially, Deputy Dickson planned for Crystal to talk with her friend Dusty Lee, the police chief of New Summerfield, Texas. He hoped to gain a better understanding of the situation after Crystal and Lee spoke. But after riding with Crystal for a few minutes, Deputy Dickson determined that Crystal needed medical attention. He requested that an ambulance meet them at Running Rudy's, a convenience store in the area, and transport Crystal to a hospital.

Linda Moore and Lindy Spurgers, paramedics with ETMC-EMS, met Deputy Dickson and Crystal at Running Rudy's. There, Moore and Spurgers attempted to assist Crystal. Moore did most of the communicating with Crystal. Crystal complied with some of Moore's requests, but she also exhibited abnormal behaviors in response to Moore's requests. For instance, Crystal feigned fainting as she walked to the ambulance. Once in the ambulance, Crystal tried to leave the ambulance on one or two occasions.[1] While in the ambulance on the way to the hospital, Crystal made unusual statements and unbuckled the seatbelts on the stretcher as though she was going to exit the moving vehicle. Moore did not request that Spurgers stop the ambulance until Crystal could be restrained. Instead, Moore locked the back ambulance door and continued to employ a talk-down verbal technique to control Crystal's behavior.

Nevertheless, Crystal's abnormal behavior persisted. Crystal stood in the back of the ambulance, opened the rear door, and jumped from the moving ambulance. She died from her injuries.

The Delaunes brought suit against Moore, Spurgers, and ETMC-EMS. Moore and Spurgers filed a motion for summary judgment in which they asserted that, pursuant to the "Good Samaritan" statute, they could not be liable for damages unless their actions were wilfully and wantonly negligent.[2] The Delaunes filed a response to Moore and Spurgers's motion in which they contended that section 74.152 did not apply to the treatment Crystal received from Moore and Spurgers. They also argued that, if it applied, there was evidence that Moore and

---

[1] Moore believed Crystal attempted to leave the parked ambulance once, while Deputy Dickson believed she tried to exit twice.

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.152 (West 2011).

2

Spurgers were wilfully and wantonly negligent. The trial court granted Moore and Spurgers's motion for summary judgment.

The Delaunes contended that ETMC-EMS failed to train Moore and Spurgers on the proper use of restraints, and that claim proceeded to trial. The jury agreed with the Delaunes and awarded damages. The trial court rendered judgment in accordance with the jury's verdict, and this appeal followed.

LEGAL SUFFICIENCY OF THE EVIDENCE

In its first issue, ETMC-EMS contends that the evidence is legally insufficient to establish proximate cause. Specifically, ETMC-EMS alleges that proximate cause is foreclosed under the Delaunes' negligent training theory because neither Moore nor Spurgers committed an "actionable tort" against Crystal.

In its second issue, ETMC-EMS contends that the evidence is legally insufficient as to the applicable standard of care and whether ETMC-EMS breached that standard. More particularly, ETMC-EMS argues that the Delaunes produced no evidence regarding the standard of care applicable to its training of Moore and Spurgers. Similarly, ETMC-EMS asserts that the Delaunes produced no evidence of any breach of the standard of care by ETMC-EMS in its training of Moore and Spurgers.

Because both issues are challenges to the legal sufficiency of the evidence, we address them together.

**Standard of Review**

A party who challenges the legal sufficiency of the evidence to support an issue on which it did not have the burden of proof at trial must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). A legal sufficiency challenge may be sustained only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In reviewing for legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict, indulging every reasonable inference that would support it. *Id.* at 822. To determine

whether legally sufficient evidence supports a challenged finding of fact, the reviewing court must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id*. Anything more than a scintilla of evidence is legally sufficient to support the finding. *See Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

## Applicable Law

To establish negligence, a party must produce evidence that (1) another party owed it a legal duty, (2) the other party breached that duty, and (3) damages were proximately caused by that breach. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). An employer owes a duty to the general public to ascertain the qualifications and competence of the employees it hires, especially when the employees are engaged in occupations that require skill or experience and that could be hazardous to the safety of others. *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App.—Fort Worth 2008, no pet.). In the context of negligent training, the evidence must establish that (1) the employer owed the plaintiff a legal duty to train competent employees, (2) the employer breached that duty, and (3) the breach proximately caused the plaintiff's injury. *Wal-Mart Stores, Inc. v. Aguilera-Sanchez*, No. 04-02-00458-CV, 2003 WL 21338174, at *5 (Tex. App.—San Antonio June 11, 2003, pet. denied). A plaintiff must prove that a reasonably prudent employer would have provided training beyond that which was given and that failure to do so proximately caused his injuries. *Dangerfield*, 264 S.W.3d at 912.

A medical care provider must train competent employees. *See Bowser v. Craig Ranch Emergency Hosp., L.L.C.*, No. 05-14-00501-CV, 2015 WL 3946371, at *4 (Tex. App.—Dallas June 29, 2015, no pet.) (mem. op.). The standard of care for a medical care provider is what an ordinary prudent medical care provider would do under the same or similar circumstances. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001).

Some of our sister courts have held that negligent training is not a proximate cause of the plaintiff's injury unless the plaintiff presents evidence that the improperly trained employee "commit[ted] an actionable tort recognized under common law." *See id*. The rationale is that an employer "is not liable for negligence, no matter how egregious, unless the negligence causes a legally compensable injury." *Gonzales v. Willis*, 995 S.W.2d 729, 739 (Tex. App.—San

Antonio 1999, no pet.), *overruled in part on other grounds by* **Hoffman-La Roche Inc. v. Zeltwanger**, 144 S.W.3d 438, 447-48 (Tex. 2004). In addressing a negligent hiring claim, the Supreme Court of Texas stated that "such a claim requires that the plaintiff suffer some damages from the foreseeable misconduct of an employee hired pursuant to the defendant's negligent practices." **Wansey v. Hole**, 379 S.W.3d 246, 247 (Tex. 2012). But, in so holding, the supreme court made clear that it simply was enforcing the general rule that a plaintiff establish that the defendant's negligence proximately caused the plaintiff's damages. *See id.* at 248 ("Because [the plaintiff] presented no evidence of harm caused by an employee hired pursuant to [the defendant]'s hiring policies, we hold she did not present legally sufficient evidence of damages proximately caused by [the defendant]'s alleged negligence.").

Proximate cause requires proof of both cause in fact and foreseeability. *See* **Excel Corp. v. Apodaca**, 81 S.W.3d 817, 820 (Tex. 2002). Cause in fact further requires proof that the act or omission was a substantial factor in causing the injury "without which the harm would not have occurred." *See* **Doe v. Boys Clubs of Greater Dallas, Inc.**, 907 S.W.2d 472, 477 (Tex. 1995). To be a "substantial" factor, the act or omission must have such an effect in producing the harm as to lead reasonable people to regard it as a cause. *See* **Union Pump Co. v. Allbritton**, 898 S.W.2d 773, 776 (Tex. 1995). "Substantial" is used in the popular sense, in which there always lurks the idea of responsibility, instead of simply the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. *Id.* Foreseeability requires that the negligent actor anticipated, or should have anticipated, the danger his or her negligence created. **El Chico Corp. v. Poole**, 732 S.W.2d 306, 313 (Tex. 1987). The exact injury need not be foreseen, but instead foreseeability is satisfied when the injury is of a general character that could reasonably be anticipated. **Lee Lewis Constr.**, 70 S.W.3d at 785.

### *Degree of Negligence Required*

ETMC-EMS argues that the trial court found Moore and Spurgers were not negligent in their care for Crystal, and thus, ETMC's training of Moore and Spurgers could not be a proximate cause of the Delaunes' injuries.

Contrary to ETMC-EMS's assertion, the trial court found that Moore and Spurgers were not wilfully and wantonly negligent. This is the standard of conduct imposed by the legislature to hold emergency medical service personnel, such as Moore and Spurgers, liable for the care

5

they administer. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.152. ETMC-EMS's level of care to avoid liability is simple negligence, not the higher wilfully and wantonly negligent standard. *See id*. The Delaunes' burden to establish proximate cause was to present evidence that ETMC-EMS's training of Moore and Spurgers was a cause in fact (substantial factor) to a foreseeable injury. *See Excel Corp.*, 81 S.W.3d at 820. For ETMC-EMS's training to be a substantial factor in the Deluanes' injuries, the training must have caused negligent care by Moore or Spurgers, but not necessarily wilfully and wantonly negligent care. *See Wal-Mart Stores, Inc.*, 2003 WL 21338174, at *5 (stating that proximate cause in negligent training case required the negligently trained employee to have committed an "actionable tort recognized under common law").

### *Moore's and Spurgers's Care of Crystal*

ETMC-EMS contends that Moore and Spurgers exercised judgment in deciding not to restrain Crystal. As such, ETMC-EMS argues that the jury was not free to infer that Moore and Spurgers lacked training on when to restrain Crystal simply because they failed to actually restrain her. Thus, the argument continues, ETMC-EMS's negligent training was not a proximate cause of the Delaunes' injuries.

When Moore and Spurgers encountered Crystal at Running Rudy's, Crystal was in the back of Deputy Dickson's police car. She exited the police car and began walking toward the ambulance in compliance with Moore's request. However, Crystal feigned fainting, kneeled to the ground, and then laid down. Moore used the talk-down technique to get Crystal to stand up and walk to the ambulance. Crystal entered the ambulance and then attempted to exit. According to Deputy Dickson, Crystal tried to leave the ambulance a second time before agreeing to be transported to the hospital. Moore again used the talk-down technique to bring Crystal into compliance with Moore's requests. Once the ambulance was en route to the hospital, Crystal unlatched the straps on the stretcher and sat up. Moore again utilized the talk-down technique. Moore stated that she believed the talk-down technique was effective because Crystal did not get completely off the stretcher. Moore further stated that, from her training, the talk-down technique was working.

When Crystal sat up on the stretcher, Spurgers began to stop the ambulance. She also contacted the Cherokee County Sheriff's Office for help. However, based on her training, Moore believed that the talk-down technique was working, so Spurgers cancelled the call for assistance and they continued traveling toward the hospital.

Shortly thereafter, Crystal told Moore that Moore was the devil and was going to kill Spurgers. Spurgers was driving the ambulance at the time. Crystal told Moore that Moore needed to speak in tongues or she was going to hell. The talk-down technique failed to stop Crystal from yelling at Moore. Crystal then put her hand near Moore's face. Once again, Moore attempted the talk-down technique. Crystal again unlatched the straps from the stretcher, stood up in the back of the ambulance, and exited the ambulance while it was traveling down the highway. Moore grabbed Crystal's clothes just before she exited the ambulance, but Crystal began to pull Moore with her, which caused Moore to release Crystal.

### *Need to Proceed to Physical Restraint*

Moore and Spurgers did not believe that Crystal was attempting suicide at the time of her death. They recognized that Crystal had a behavioral disorder. They observed that she was confused, displaying auditory and visual hallucinations, and may have been psychotic and delusional. They believed that Crystal had lost touch with reality when she exited the back of the moving ambulance.

Crystal was not cooperative at all times during Moore's encounter with her, and Moore recognized that Crystal could hurt herself. In fact, Moore had locked the back door of the ambulance after Crystal sat up on the stretcher while the ambulance was moving because Moore was concerned that Crystal would attempt to exit the vehicle. Nevertheless, Moore believed that her training required her to attempt the talk-down technique first rather than move to physical restraint. Moore stated that she was trained to keep trying the talk-down technique until it completely did not work, and that she would restrain a patient only when the verbal technique totally failed. She believed her training required her to talk to patients even upon realizing that they were out of touch with reality. She was trained not to use restraints until a patient "become[s] physical to you or to themselves." Moore testified that she attended to Crystal in a manner consistent with her training.

The Delaunes presented evidence that Moore and Spurgers were negligent in their care. Dr. Marvin Wayne, the Delaunes' expert on training of emergency medical providers,[3] stated that Crystal was in an emotional crisis or experiencing a behavioral disorder on the night of her death. He testified that patients with behavioral disorders who need to be restrained can injure

---

[3] Dr. Wayne had experience training emergency medical providers on when and how to use restraints for patients with behavioral disorders.

themselves if they are not restrained. Dr. Wayne further contended that Crystal should have been restrained, and Moore and Spurgers should have been trained to restrain a patient acting like Crystal. Dr. Wayne stated that it was negligent for Moore and Spurgers to continue the talk-down technique once it had proven ineffective. He testified that the technique had proven ineffective with Crystal because she would comply temporarily, but subsequently fail to comply. He opined that Moore and Spurgers should have recognized that Crystal was not reliable, that the talk-down technique had lost its effectiveness, and that physical restraint was necessary. He concluded that their education and training failed them because they (1) focused on the talk-down technique only when confronted with an acute behavioral emergency, (2) did not possess and were not clearly tested on when and how to move from the talk-down technique to physical restraint of patients with behavioral disorders, and (3) were taught to keep using the talk-down technique even when it had proven ineffective.

Dr. John Tennison, a psychiatrist who testified as one of the Delaunes' expert witnesses, concurred that Crystal was psychotic and delusional. He further stated that the talk-down technique was not reliable with psychotic and delusional patients because they are out of touch with reality. Dr. Tennison also stated that there was no reason to refrain from physically restraining Crystal.

### *Standard of Care and Breach*

As we have stated, a medical care provider has a duty to train competent employees. *See Bowser*, 2015 WL 3946371, at \*4. A medical provider also has a duty to use reasonable care in formulating and enforcing the policies and procedures that govern its personnel. *See id.*; *Mills v. Angel*, 995 S.W.2d 262, 269 (Tex. App.—Texarkana 1999, no pet.). It has also been held that a hospital has a duty to periodically monitor and review the competency of the members of its medical staff. *See Ching v. Methodist Children's Hospital*, 134 S.W.3d 235, 241 (Tex. App.—Amarillo 2003, pet. denied). Based on these duties, it follows that ETMC-EMS had a duty to exercise reasonable care in assessing Moore's and Spurgers's competency in what they were taught as part of their training pursuant to ETMC-EMS policies and protocols on restraining patients with behavioral disorders.

According to Dr. Wayne, by failing to train Moore and Spurgers that a patient acting as Crystal was acting needed to be physically restrained, ETMC-EMS's training of Moore and Spurgers fell below the standard of care. ETMC-EMS claimed to have taught Moore and

8

Spurgers physical restraint. But Dr. Wayne concluded that their actions at the time of the incident and their testimony afterwards indicated that Moore and Spurgers did not know when a situation justified abandoning the talk-down technique and physically restraining the patient. Accordingly, Dr. Wayne opined that ETMC-EMS's training of Moore and Spurgers fell below the standard of care and was unreasonable.[4]

Moore agreed that ETMC-EMS must train its paramedics to restrain patients in emotional crisis when their abnormal behavior persists, despite talking down, and jeopardizes the safety of the patients themselves. Moore testified that she was trained to use the talk-down technique at all times, and that there was no set number of times after which she should stop attempting the talk-down technique. Moore recognized that she was unable to create a reality base with Crystal, but she nevertheless believed that her training required her to continue the talk-down technique. Additionally, Moore admitted that at her deposition she did not remember her training regarding the use of soft restraints. Moore said that at Rusk State Hospital, she was trained to use the talk-down technique at any cost. She then said that she meant she was trained to use the talk-down technique for any length of time, and that physical and chemical restraints were the "last resort." She testified her training at Rusk State Hospital was the same as her training for ETMC-EMS.

Spurgers wavered in agreeing whether paramedics should be trained to restrain patients in emotional crisis when their abnormal behavior persists despite talking down and jeopardizes the safety of the providers, the patients themselves, or others. Spurgers explained that she was trained to use the talk-down technique with psychotic and delusional patients. Spurgers had been trained to always use talk-down first unless a patient had hurt herself or was combative. However, Spurgers believed that if the talk-down technique did not work, restraints were a proper tool.

Spurgers testified that ETMC-EMS trained its paramedics to use restraints only when a patient did not follow verbal commands. ETMC-EMS further trained its paramedics, according to Spurgers, to continue the talk-down technique if a patient vacillates between compliance and lack of compliance to verbal commands, such as the behavior Crystal exhibited. Spurgers said that Crystal would be classified as cooperating because she was not fighting or swinging at either

---

[4] Moreover, the training materials repeatedly emphasize that restraints are a last resort and are to be used only when necessary. The materials explain that the paramedic may restrain a patient if she has good reason to believe that the patient is a danger to the paramedic, herself, or others. But the materials do not provide further guidance, especially in situations like this when the patient complies intermittently with the paramedic's requests.

Spurgers or Moore. Spurgers further testified that ETMC-EMS trained its paramedics not to use physical restraints on a patient until the patient was swinging at the paramedic. Spurgers testified that the talk-down technique was working until Crystal went out the back of the ambulance.

There also was evidence contrary to the verdict. Dr. Wayne conceded that Moore and Spurgers had training from entities other than ETMC-EMS. Both Moore and Spurgers had training from paramedic school. Moore also had training from Rusk State Hospital, a psychiatric hospital where she cared for many patients with behavioral disorders. Dr. Wayne also conceded that paramedics exercise judgment about how to care for patients and that he did not know what ETMC-EMS did in terms of review of its protocols with its paramedics to insure that they understood the protocols. Furthermore, Dr. Wayne did not testify that ETMC-EMS's restraint training was inadequate in substance or frequency. In fact, Dr. Wayne agreed that ETMC-EMS's training program tracked national organization guidelines. However, Dr. Wayne opined that ETMC-EMS failed to properly assess whether Moore and Spurgers understood the teachings given to them on restraint.

ETMC-EMS countered that Moore and Spurgers were aware of ETMC-EMS's Behavioral Policy, the use of restraints, and the application of the restraints. Moore and Spurgers were tested on their knowledge and ability to use talk-down techniques, physical restraints, and chemical restraints. They also were tested on ETMC-EMS protocols on an annual basis. Moore and Spurgers also were tested by state and national certifying bodies for emergency medical providers.

Dr. David Paul Lehrfeld, ETMC-EMS's expert on training of emergency medical providers, testified that ETMC-EMS's training of its paramedics was standard and in line with national registry requirements for certification of paramedics. Dr. Lehrfeld also believed that physical restraints should be used only when a patient failed to cooperate with verbal instruction or, stated another way, the talk-down technique failed. He claimed that physically restraining a patient was a high risk maneuver that should be avoided if at all possible. Dr. Lehrfeld was clear that the talk-down technique was the preferred technique for interacting with a patient who has a behavioral disorder. Dr. Lehrfeld also clarified that the paramedic should continue the talk-down technique even if she needs to physically restrain the patient because the control techniques are additive. Dr. Lehrfeld stated that physical restraint was necessary when there was an imminent

10

threat to the patient, the providers, or others, so it becomes a matter of judgment for the paramedic.

Dr. William Moore, the medical director for ETMC-EMS, was heavily involved in the training of paramedics. He stated that ETMC-EMS utilized the talk-down technique in most situations because it was better for the paramedics and the patients. Dr. Moore stated that the use of restraints could lead to a fight and that, "[i]f you're going to have to restrain them, that's the last thing you should do. And it's the thing that's most likely—it's much more likely to get somebody hurt." According to several studies, injuries were less likely to occur with the talk-down technique than with applying physical restraints. However, Dr. Moore stated that the paramedics were trained that physical restraint was necessary when a patient was striking out or could harm either the paramedics, herself, or others. Moore also explained that the paramedics were regularly tested to ensure competency.

The evidence of standard of care and breach was heavily contested and contradictory. It was within the jury's province to resolve conflicts in the evidence. *See City of Keller*, 168 S.W.3d at 819. A rational jury could have concluded that Moore's and Spurgers's training was inadequate in teaching them when to restrain unreliable patients such as Crystal who had a behavioral disorder resulting in a loss of touch with reality, who intermittently comply with the talk-down technique, but also demonstrate the tendency to attempt to exit the ambulance on multiple occasions. Viewing all the evidence in the light most favorable to the verdict, we conclude that the Delaunes presented more than a scintilla of evidence that ETMC-EMS breached the standard of care, and thus, the evidence is legally sufficient to support the verdict. *See Cont'l Coffee Prods. Co.*, 937 S.W.2d at 450.

ETMC-EMS's second issue is overruled.

**Proximate Cause**

Dr. Wayne stated that it was foreseeable that a failure to train emergency medical providers as to how and when to physically restrain a patient can result in injuries to that patient. He testified that because ETMC-EMS's failed to properly train Moore and Spurgers to recognize that Crystal needed to be physically restrained, Crystal exited the back of a moving ambulance.

Spurgers agreed that Crystal probably would not have gone out the back of the ambulance if she had been physically restrained to the stretcher. Dr. Lehrfeld conceded that when someone was acting as Crystal acted, there was a risk that the person can go out the back

of the ambulance if she is not restrained. He conceded that ETMC-EMS should have trained its paramedics to restrain patients in emotional crisis who repeatedly try to leave the ambulance, despite talk-down, and jeopardize their safety. Dr. Lehrfeld agreed that Crystal would have lived if Moore and Spurgers had used physical restraints on her.

There also is evidence contrary to the verdict. Dr. Lehrfeld testified that ETMC-EMS's training of its paramedics was standard and in line with national registry requirements for certification of paramedics. Dr. Lehrfeld did not believe that ETMC-EMS's training was a cause of Crystal's death. Dr. Lehrfeld testified that a medical provider must allow its paramedics to utilize their own judgment, and that rules and protocols are important, but rules and protocols do not cover every situation. However, Dr. Lehrfeld conceded that a patient could be injured if paramedics were not trained properly on when to use restraints.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have determined that ETMC-EMS's training of Moore and Spurgers was a proximate cause of the Delaunes' injuries. Accordingly, we hold that the evidence is legally sufficient as to proximate cause.

ETMC-EMS's first issue is overruled.

## DISPOSITION

Having overruled ETMC-EMS's first and second issues, we *affirm* the judgment of the trial court.

**BRIAN HOYLE**
Justice

Opinion delivered November 30, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

12



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**NOVEMBER 30, 2015**

**NO. 12-15-00014-CV**

**EAST TEXAS MEDICAL CENTER D/B/A EAST TEXAS MEDICAL CENTER EMERGENCY MEDICAL SERVICES,**
Appellant
V.
**JODY DELAUNE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF CRYSTAL DELAUNE, DECEASED AND AS NEXT FRIEND OF D. D., D. D. AND D. A. D., MINORS,**
Appellee

Appeal from the 7th District Court

of Smith County, Texas (Tr.Ct.No. 13-0984-A)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellant, **EAST TEXAS MEDICAL CENTER D/B/A EAST TEXAS MEDICAL CENTER EMERGENCY MEDICAL SERVICES,** for which execution may issue, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*